77 N.J. Super. 155 (1962)
185 A.2d 682
R.H. MACY & CO., INC., PETITIONER-APPELLANT,
v.
DIRECTOR, DIVISION OF TAXATION, STATE OF NEW JERSEY, RESPONDENT-RESPONDENT. [1956, 1957 and 1958 Assessments]
Superior Court of New Jersey, Appellate Division.
Argued September 10, 1962.
Decided November 15, 1962.
*159 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Walter H. Jones argued the cause for appellant (Mr. Marvin H. Gladstone, and Mr. Nathan Dreizen of the New York bar, on the brief).
Mr. Alan B. Handler, Deputy Attorney General, argued the cause for respondent (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by CONFORD, S.J.A.D.
In this appeal R.H. Macy & Co., Inc. ("Macy" hereinafter) seeks a review of a decision of the Division of Tax Appeals rejecting its complaints against revision by the Division of Taxation of its reported net worth for purposes of the Corporation Business Tax Act (N.J.S.A. 54:10A-1 et seq.) for the privilege years 1956, 1957 and 1958 (base years ending December 31, 1955, 1956 and 1957, respectively). The resulting deficiency assessments for the respective years in question were $4,816.79, $6,524.09 and $7,167.03.
The statute referred to is a corporation franchise tax act, enacted by L. 1945, c. 162, and applicable both to foreign corporations transacting business in this State, like Macy, and domestic corporations. Basically, it imposes a tax measured by a low rate against the taxpayer's book net worth. The act contains allocation formulae for corporations which maintain regular places of business outside New Jersey, but no problem is presented with relation thereto in this case.
The reassessments by the Division of Taxation disputed in this case involve three items: (a) a substitution of "Fifo" in the place of "Lifo" costs (both terms are explained hereinafter) in determination of inventory values; (b) a revision downward of bad debt reserves; and (c) a disallowance of *160 deduction for debt owing from a wholly-owned subsidiary, Garden State Plaza Corporation, a New Jersey corporation. Incidental to the dispute over revision of inventory valuations is the alternative contention of Macy that if its Lifo-based inventory valuations are to be revised, there should at the same time be deducted from its net book valuations certain claims listed as assets in its books for refunds of federal income taxes based upon the asserted right to use the Lifo method for income tax purposes for six income tax years preceding 1947.
Certain other attacks upon the action of the Division of Taxation and upon the tax statute, only incidentally affecting the meritorious questions mentioned above, have been made by Macy. All of these matters are considered in the course of this opinion.

I. INVENTORIES
Macy's franchise taxes were required to be assessed upon the basis of its books as of the end of a calendar or fiscal year. N.J.S.A. 54:10A-4(d). For the tax years, here in question, 1956, 1957 and 1958, Macy's books reflected merchandise inventories, at the close of the pertinent fiscal years, as follows: July 30, 1955, $41,376,258; July 28, 1956, $47-926,103; and August 3, 1957, $55,340,189. However, Macy's annual reports (not its tax returns), in showing these figures under "Current Assets," and describing them as "Merchandise inventories at Lifo cost, as determined under the retail inventory method, which is less than market," appended footnotes which stated that the said figures were, respectively, $11,893,487, $12,517,651, and $13,277,806 "less than they would have been if the first-in, first-out principle had been applied in determining cost." The "first-in, first-out principle" mentioned is commonly described as Fifo, by contrast with Lifo, meaning the "last-in, first-out principle."
These terms, according to the expert proofs in this case and standard accounting texts, have the following meanings. Inventory *161 costs are determined periodically in merchandising businesses for two principal purposes: (1) reflection of merchandise inventory as an asset on the balance sheet as of a given date; and (2) reflection of profits or net income during specific earnings periods, since closing inventories are instrumental in determining cost-of-goods-sold expense of both the current and subsequent earnings periods to be matched against revenues of such periods. However, where large quantities of items are bought and sold by a business during an accounting period it is not feasible to price inventory at the actual historical cost of each item. But since the prices paid for the merchandise in various lots of specific categories are known, the cost of closing inventories is frequently determined by artificial but convenient assumptions as to relation of identity of goods sold and goods remaining to goods purchased. One such assumption is Fifo, another, Lifo. Fifo assumes that the goods first purchased were first sold; Lifo, that the goods last purchased were first sold. From a balance sheet standpoint, Fifo has the advantage of attributing more recent costs to the closing inventory on hand, thereby affording a more realistic picture of current asset values; from an income or profit reflection standpoint, however, Lifo has the advantage of matching current revenues with current costs, thereby furnishing a more accurate picture of true business earnings or losses, as distinguished from market appreciation or depreciation of inventory values, during the earnings periods in question. Accounting theorists who favor the Lifo method describe it as based not on presumptions as to the flow of goods but rather as to the flow of costs. Where costs are stable over the respective periods involved, the stated advantages do not materialize. See Amory and Hardee, Materials on Accounting (3d ed. Herwitz and Trautman 1959), pp. 176-178, 193-211; Finney and Miller, Principles of Accounting (4th ed. 1951), pp. 360-368; Hills, Law of Accounting and Financial Statements (1957), pp. 191-192; Wixon and Cox, Principles of Accounting (1961), pp. 687-691; R.H. Macy & Co. Inc. v. United States of America, 255 F.2d 884 (2 Cir., 1958), *162 cert. denied 358 U.S. 880, 79 S.Ct. 119, 3 L.Ed.2d 110 (1958). The use of the Lifo system can result in current inventories reflecting "values" in terms of costs incurred years earlier. Wixon and Cox, op. cit., supra, at p. 691.
There are other systems for pricing inventory recognized as acceptable from the standpoint of sound accounting principles, such as average cost, weighted average cost and specific identification, but these do not bear upon the issues herein. Two other matters discussed in the evidence in this case also appear not to be directly material to determination of the precise issue before the court. The first is that inventory costs, within the Lifo principle, are arrived at by Macy by the "retail inventory method"; the second, that all sound inventory accounting, including Macy's method, aims to reflect "cost or market, whichever is lower."
In the letter of reassessment from the Corporation Tax Bureau of the Division of Taxation to the taxpayer readjusting the values for the years in question, the treatment of inventory is explained as follows: "Inventory reserve is disallowed inasmuch as the Bureau deems inventory values to be the most recent cost to the date of the Balance Sheet." The readjustment made was to substitute the Fifo figures as shown in the footnotes of the annual reports for the Lifo figures shown on the balance sheets. The representative of the Bureau testified that the determination was that the Fifo valuations were "a closer approximation of the fair value of the inventories."
Resolution of the dispute here presented requires construction of the statute. N.J.S.A. 54:10A-5 imposes a franchise tax computed upon that portion of the "entire net worth" of the corporation allocable to this State multiplied by the applicable rates. N.J.S.A. 54:10A-4 defines "net worth" as follows:
"(d) `Net worth' shall mean the aggregate of the values disclosed by the books of the corporation for (1) issued and outstanding capital stock, (2) paid-in or capital surplus, (3) earned surplus and undivided profits, (4) surplus reserves which can reasonably be *163 expected to accrue to holders or owners of equitable shares, not including reasonable valuation reserves, such as reserves for depreciation or obsolescence or depletion, and (5) the amount of all indebtedness owing directly or indirectly to holders of 10% or more of the aggregate outstanding shares of the taxpayer's capital stock of all classes, as of the close of a calendar or fiscal year. However, if in the opinion of the commissioner, the corporation's books do not disclose fair valuations the commissioner may make a reasonable determination of the net worth which, in his opinion, would reflect the fair value of the assets carried on the books of the corporation, in accordance with sound accounting principles, and such determination shall be used as net worth for the purpose of this act."
The act was changed in certain respects, effective beginning with the year 1959, L. 1958, c. 63, but the definition of "net worth" was not altered.
Since merchandise inventory is an asset entering into the aggregate of components (1) through (4) of the foregoing listed constituents of "net worth," Macy does not contend that a lawful redetermination of inventory would not result in a proper recomputation of the tax base. But it does challenge the lawfulness of the redetermination of inventory here made.
Expert accountancy testimony on both sides at the hearing before the Division of Tax Appeals was in agreement that both Fifo and Lifo were accepted methods of determining inventory costs for a retail merchandising business such as Macy's, "in accordance with sound accounting principles." The expert for the State testified that under the Lifo method the inventory is valued "at the costs that were prevalent at the time that the Lifo cycle commenced, which would be in the most distant past * * *. They would be the ancient or former costs rather than the current costs." In essence, the expert for the taxpayer was in agreement as to this. In the opinion of the State's expert the determination of the taxing authorities to utilize the Fifo valuations in this case was a "reasonable determination reflecting the fair value of the inventory assets carried on the books of the corporation," and one "in accordance with sound accounting principles."
The opinion of Macy's expert was that "there is only one balance sheet in accordance with sound accounting principles" *164 for a particular corporation, and, in the case of Macy for the years involved, those were the statements submitted to the Division of Taxation under certification by the corporation's auditors. He explained that the footnote references in the annual reports to Fifo costs were "to help financial analysts to compare businesses." He testified that "mechanically, because of the way you compute Lifo, you do know what Fifo is."
In sustaining the position of the Division of Taxation, the opinion of the Division of Tax Appeals states:
"No witness has testified that the determination of respondent is not fair value. Indeed, the witnesses all agree that Fifo method more closely approximates market value than the Lifo method. Market value usually is deemed to be fair value."
Macy formulates its argument on this appeal by assuming that the reassessment by the Division of Taxation is based on the foregoing expression of rationale by the Division of Tax Appeals, i.e., that it equates "fair value" of inventory with "market value." It then attacks that equation by contending, on the basis of legislative history, that the Legislature did not intend to permit the Tax Division Director to use market value as a basis for establishing "fair valuations" of the assets "in accordance with sound accounting principles."
Thus, the real issue presented is whether the statute permits the Tax Division Director to revise a taxpayer's inventory asset valuations for franchise tax purposes from Lifo to Fifo costs in such circumstances as here shown, or whether the taxpayer's decision to operate on a Lifo basis for general accounting purposes compels the Director to accept its Lifo inventory costs as conclusive of "fair value" in assessing the tax.
The genesis of the Corporation Business Tax Act (1945) is found principally in the general dissatisfaction with the then existent laws for the ad valorem taxation of intangible personal property. These required the local taxing district in which the principal office of a corporation was located to tax all of its intangible personal property of whatever nature, subject to stated exemptions, and at general local tax rates. Literal enforcement of the law would have involved prohibitive tax burdens, and unfair enrichment of the taxing district involved. Although the tax act was therefore generally ignored, the threat and occasional actuality of enforcement created a fear of "tax lightning." See Duke Power Co. v. Somerset Co. Board of Taxation, 124 N.J.L. 481 (Sup. Ct. 1940), affirmed 125 N.J.L. 431 (E. & A. 1940); Duke Power Co. v. State Board of Tax Appeals, 129 N.J.L. 449 (Sup. Ct. 1943), affirmed 131 N.J.L. 275 (E. & A. 1944). This situation led to the creation in 1944 by legislative joint resolution of a Commission on Taxation of Intangible Personal Property. That body submitted a report March 26, 1945, which, among other things, recommended the abolition of taxation of intangible personal property as such and the imposition on all corporations of a corporation business tax, conceived as a franchise tax, measured basically by net worth allocable to New Jersey in lieu both of the former ad valorem taxation of intangible personal property and of the then existing franchise tax based upon capital stock issued and outstanding. The Commission defined its concept of "net worth" *166 for purposes of the proposed new franchise tax as "the average fair market value of a taxpayer's total assets minus his total liabilities" (p. 62).
The bill introduced in the Legislature to implement the recommendation of the Commission, which ultimately was enacted as the statute now before us (Assembly No. 395, introduced March 27, 1945), defined "net worth" as "the fair market value of a taxpayer's total assets less liabilities (in the determination of which the commissioner may consider book value, earnings value and the aggregate market of a corporation's capital stock) plus * * *." Among the stated purposes of the bill, as recited in the "Statement" annexed thereto, was:
"(1) to establish a simple and defensible tax on corporate business in lieu of an ad valorem tax on intangible personalty and the present capital stock tax, as part of the program recommended in the Report of the Commission on Taxation of Intangible Personal Property (March 26, 1945) to eliminate `tax lightning' on intangibles."
However, as reported out of committee (Assembly Minutes, April 6, 1945, p. 687), and enacted into law, the definition of net worth underwent a marked change, embodying substantially what we find in section 54:10A-4(d), as quoted above. There is no extrinsic evidence as to the reason for the elimination of the reference to "fair market value." The only variance in the act as enacted by L. 1945, c. 162, from the present language (effected by amendment, L. 1947, c. 50), is that, as originally enacted, the provision read in part:
"However, if in the opinion of the commissioner, the corporation's books do not disclose fair valuations the commissioner may require any additional information which may be necessary for a reasonable determination of the net worth which, in his opinion, would reflect the fair value of the assets carried on the books of the corporation, in accordance with sound accounting principles, and such determination shall be used as net worth for the purpose of this act." (Emphasis added.)
From a consideration of all the foregoing, it is apparent that, as finally enacted and as the act stood in relation to the *167 tax years in question, the Legislature was concerned with providing a relatively simple and administratively feasible formula for measuring the value of the exercise of the corporate privilege in this State. It chose to do so by using basically the taxpayer's net book worth rather than becoming enmeshed in the complexities and administrative difficulties attendant upon true value or market value appraisal of assets for that purpose, a technique more characteristic of ad valorem property taxation than of franchise taxation. As stated in Household Finance Corp. v. Director of Div. of Taxation, 36 N.J. 353, 358 (1962), in reference to the analogous Financial Business Tax Law (1946), N.J.S.A. 54:10B-1 et seq.:
"That the tax is assessed upon a portion of net worth does not mean that it is an ad valorem assessment upon any of the underlying properties."
Proceeding from these premises, we are called upon to determine, at least for the purposes of passing upon what the Tax Division here did, the ambit of its authority to make "a reasonable determination of [the taxpayer's] net worth" which would reflect "the fair value of the assets carried on the books of the corporation, in accordance with sound accounting principles." Unless this enabling provision is sheer surplusage, an hypothesis we will not entertain unless no other is reasonably inferable from the legislative language, Abbotts Dairies v. Armstrong, 14 N.J. 319, 327, 328 (1954), the face of section 54:10A-4 conveys the thought that the net worth of the assets appearing on the books of a particular corporate taxpayer may represent something other than "fair valuations" thereof, and that the Tax Director may in such case, in assessing the franchise tax, revise the book figures to reflect "fair value of the assets," providing, however, that his resulting readjustment of the figures is "in accordance with sound accounting principles." If, as Macy argues, "fair value" in the statute simply means "value as disclosed by the *168 books of the corporation maintained in accordance with sound accounting principles, consistently applied," the draftsmen of section 54:10A-4(d) as it now reads wrote most deviously. The natural method of expressing the latter concept would have been simply to say that "net worth shall mean the aggregate of the values disclosed by the books of the corporation, maintained in accordance with sound accounting principles, for (1) issued and outstanding capital stock, (2) * * *," etc. The entire last sentence of (d) becomes a dead letter under Macy's hypothesis. We reject that postulate because we conceive a meaningful purpose in that last sentence, and, as already stated, we are bound, if reasonably possible, to seek and find significance in legislative language rather than to conclude for sterility therein.
Abstractly, the term "fair value" has no fixed meaning; it generally takes color from the context in which used or applied. In terms of constitutional and statutory requirements for the taxation of real property at true value (generally understood as market or exchange value), for example, courts have sometimes equivalently referred to the standard as "fair value." Plainfield v. State Board of Tax Appeals, 126 N.J.L. 407, 408 (Sup. Ct. 1941). The same equivalence of meaning has been entertained in passing upon the fair value to be credited a mortgagor on a deficiency claim after foreclosure. Fidelity Union Trust Co. v. Ritz Holding Co., 126 N.J. Eq. 148, 149 (Ch. 1939). See also Jamouneau v. Local Government Board, 6 N.J. 281, 293 (1951).
We have recent evidence of the legislative capacity to write a tax statute wherein the taxpayer's book values are accepted as representing presumptively the taxable "fair value" of the property, subject to administrative regulation by uniform rules for the determination and reporting of factors entering into book values, such as costs and depreciation. L. 1960, c. 51; N.J.S.A. 54:4-2.29 (dealing with the ad valorem taxation of tangible personal property used in business). Compare the provision in the same statute (N.J.S.A. 54:4-9.1) for taxation of tangible personal property not used *169 in business, as based upon designated percentages of "the fair value thereof, which shall be the fair market value thereof," and for the taxation of tangible household property and personal effects, at designated percentages of "fair value," defined as "the value thereof for each household if offered for sale as a single lot." N.J.S.A. 54:4-9.2.
The circumstance that the 1945 Legislature failed to define "fair valuations" in the Corporation Business Tax Act with the precision that a later Legislature did in relation to an entirely different kind of tax statute, but only by implication from the context of the act, will not justify the court in confining itself to the alternatives of meaninglessness or unconstitutional vagueness of standard, as in effect argued by Macy in this case. The court can and should look for clarification of meaning of statutory standards where discernible from the whole of the specific or cognate statutes. See Ward v. Scott, 11 N.J. 117, 123 (1952).
We are not called upon here to explore and delineate the whole potential range of applications of the standard, "fair value of the assets carried on the books of the corporation, in accordance with sound accounting principles," in the act under construction. We have but to determine whether a reasonable and rational interpretation of the phrase, in the light of the purposes and objects of the act as a whole, permitted the Division of Taxation to do what it here did in relation to readjusting the values of inventories. We decide that question in the affirmative.
Of the two generally recognized principal purposes of financial statements under sound accounting, reflection of income and reflection of current worth, Finney and Miller, Principles of Accounting, op. cit., supra, at p. 1, the statutory section here involved is obviously concerned with the second, not the first. And since reporting of net worth under the act is made as of the close of the taxpayer's annual accounting period next preceding the commencement of the tax year for which the tax is payable, a selection of asset valuations more proximate in time to that date would appear reasonably *170 preferable, as against older valuations, if selection of either is consistent with sound accounting principles. At the least, we are not disposed as a court to quarrel with the expert administrative judgment that the recent rather than the older costs are the "fair valuations," within the intent of the act. The alternative Fifo and Lifo inventory values in this case, under the evidence adduced, both represented the taxpayer's costs or market, whichever was lower, and the use of either was therefore in accordance with sound accounting principles. Since the Fifo costs reflected a time or times substantially closer to the close of the respective accounting periods applicable to the tax years in question than would Lifo costs, the Division of Taxation was not arbitrary in concluding that they provided the more realistic and the more reasonable reflection of current net worth of the corporation insofar as inventory is concerned, and thus the fair valuations thereof. The remoteness of Macy's Lifo costs in relation to the respective assessing dates here involved is cogently reflected by the substantial stated differences between its Lifo and Fifo figures, indicative of the conceded fact that the periods of time involved represented an era of rising costs. Under the circumstances, the Division of Taxation could properly regard the Lifo figures as not constituting "fair valuations" for the specific purpose at hand. In short, we conclude that a fair judicial effort to apply a sensible construction to the legislative authorization to the Division of Taxation to fix a "fair value of the assets carried on the books of the corporation, in accordance with sound accounting principles," must produce accord with the interpretation by the Director of his statutory powers and with the exercise thereof in this instance as to Macy's inventories. Cf. National Tube Co. v. Peck, 159 Ohio St. 98, 111 N.E.2d 11 (Sup. Ct. 1953), where the statute failed to give the tax commissioner any power to readjust reported book values, but required him to accept them if he found the corporation's report "correct."

*171 II. THE LIFO REFUND CLAIM
Macy showed on its books as an asset for each of the franchise tax years here in question a $9,018,699 federal income tax refund claim for the six income tax years ending January 1947. The claim against the United States was based on the contention that Macy's taxable income for those income tax years should have been permitted to be computed by using the Lifo method of costing closing inventories. On May 12, 1958 there was an adverse decision as to the 1942 claim, R.H. Macy & Co., Inc. v. United States of America, supra, and on December 11, 1961 as to the 1943-1947 claims, R.H. Macy & Co., Inc. v. United States of America, 202 F. Supp. 206 (S.D.N.Y. 1961). An appeal pends as to the latter claims. Both decisions were based on failure to make timely election under the federal tax regulations to use Lifo for income tax purposes for the income tax years involved.
Macy never claimed before the Director or the Division of Tax Appeals that the valuation of its assets should be reduced for franchise tax purposes by elimination of the Lifo refund claim because that claim had no value, or less value than the figure stated on its financial statements as of the dates thereof, nor does it so claim on this appeal. Its sole contention below and here is that it is inconsistent and therefore "inequitable" to retain the claim of income tax refund as an asset for franchise tax purposes at the same time that the Division of Taxation has readjusted its franchise tax obligations for 1956-1958 by rejection of Lifo in favor of Fifo inventory costs.
We find the argument without merit. There is no incompatibility at all, either in logic or fairness, between treating the income tax claim as the asset Macy's books showed it to be and at the same time concluding that the fair value of the inventories, as such, was represented by their Fifo costs for the franchise tax years here in question. The fact that the refund claim against the Government on account of 1942-1947 income taxes was based upon an asserted right to measure *172 taxable income by the Lifo method has no relevance whatever to the Tax Division's determination that the fair value of Macy's inventories as components of net worth for 1956-1958 franchise tax purposes was represented by Fifo rather than Lifo costs.

III. BAD DEBT RESERVES
Macy's accounts receivable were reported less reserves for doubtful accounts of 3.48% for 1956, 3.1% for 1957 and 2.72% for 1958. The Tax Division adjusted these reserves uniformly to 2.5% of receivables on the ground that "the taxpayer's past experience with respect to bad debts" indicated the 2.5% to be "a reasonable reserve" for that purpose.
The proofs indicated that Macy's ratios of actual write-offs of uncollectible accounts to gross receivables for the respective years in question were 1.9%, .9% and 1.24%. The average for the three years was approximately 1.1% as against the 2.5% allowed by the Tax Division in its readjustment. Average write-offs for five-year periods preceding the tax years in question did not exceed in percentages the write-off ratios for the tax years here involved.
We have considered the argument addressed against the Tax Division's action and find ourselves in disagreement. The most relevant criterion, although concededly not the only one, in the establishment of a reasonable reserve for bad debts, is the history of recent actual write-offs. Allied Building Credits, Inc. v. Bowers, 170 Ohio St. 334, 164 N.E.2d 562 (Sup. Ct. 1960); S.W. Coe & Co. v. Dallman, 216 F.2d 566 (7 Cir. 1954). We cannot find any arbitrariness in the administrative determination that 2.5% would constitute a reasonable reserve for bad debts, reflecting the fair value of the accounts receivable, consistent with sound accounting principles. After all, this allowance is almost two and a half times the corporation's then recent actual write-off experience.
Macy argues that the reserves it had set up reflected in part its practice of repurchasing sold accounts receivable *173 which are not collected by its assignees, notwithstanding it sells the accounts without recourse. But it does not appear that such sold accounts were reported in Macy's returns as a part of its accounts receivable assets. Nor were there any proofs as to what their volume was or as to Macy's actual losses with respect to them, either in dollars or percentages. The contention does not aid Macy's case as to this item.

IV. DEDUCTION FOR DEBT OWING BY SUBSIDIARY
Macy's returns for the tax years 1957 and 1958 reflected a deduction from net worth of the aggregate of the value of its stock in, and debt owing to it by, its wholly owned subsidiary, Garden State Plaza Corporation, a New Jersey corporation. It claimed the right so to do by virtue of N.J.S.A. 54:10A-9, which provides, in pertinent part:
"Any taxpayer which holds capital stock of a subsidiary during all or part of any year may, for the purposes of the tax imposed by this act, deduct from its net worth such proportion of the average value of such holdings less net liabilities (if any) to subsidiaries, as the ratio of the subsidiary's taxable net worth, for the same year under this act, to its entire net worth; * * *." (Emphasis added.)
The Division of Taxation disallowed the deduction to the extent that it comprehended Garden State's debt to Macy, taking the position that the deductible "holdings" mentioned in the statute meant only the capital stock in Garden State held by Macy, not debt owing to it by the subsidiary. There is no doubt in our minds that the State's position as to this is correct and that there is not even a shadow of ambiguity in the pertinent statutory language. The reference, "such holdings," can only be read as relating back to the antecedent, "Any taxpayer which holds capital stock of a subsidiary," etc. (Emphasis added). Neither the administrative agency nor we may take liberties with statutory language so clearly expressed, see State v. Patfol, Inc., 76 N.J. Super. 287 (App. Div. 1962), even to subserve a supposedly desirable policy not effectuated by the act as written.
*174 Macy stresses that Garden State's whole debt to it must be included in Garden State's net worth under the act, N.J.S.A. 54:10A-4(d) (5), and argues that therefore, unless Macy can deduct Garden State's indebtedness to it from its own net worth, double taxation results. It may first be observed that this is a franchise tax, not a property tax, and therefore, the assets not being taxed as such, there is no double tax on any property. To the extent that specific property or choses may incidentally become involved in the tax base of more than one corporation, this is by no means unusual or legally invidious, providing classifications are not arbitrary. See St. Louis Southwestern Ry. Co. v. Arkansas ex rel. Norwood, 235 U.S. 350, 35 S.Ct. 99, 59 L.Ed. 265 (1914). The classifications here are not shown to be arbitrary.
Macy does not argue that if the Director's ruling is sustained the resulting tax is unconstitutional, nor do we believe such a position would be sound. To the extent that the argument made is offered as a guide as to the probable legislative intent, it cannot prevail against the plain statutory language to the contrary.

V. ULTRA VIRES
Macy contends that the redetermination of the assessment was made by the Corporation Tax Bureau in the Division of Taxation, not by the Director of the Division of Taxation, and that since there is no statutory authorization of delegation by the Director of any of his powers to any subagent or subagency, the reassessment is a nullity. We pass the objection by the State that this argument comes too late, not having been raised before the Division of Tax Appeals. The public importance of the issue calls for its disposition on the merits.
It is unquestionably sound law that, generally speaking, a delegated power cannot be further delegated, 42 Am. Jur., Public Administrative Law, § 73, p. 387, but implicit *175 in the rule is the qualification that there is no indication that the Legislature intends otherwise. The rule is essentially one of presumption of intent in statutory construction. However, there is abundant evidence that it is not actually contrary to the legislative intent that such a reassessment as was here made by the Corporation Tax Bureau as a subagency within the Division of Taxation should be within its permissive purview as delegate of the Director.
In determining the question before us we must consider all legislation bearing upon the administrative duties and powers of the Director of the Division of Taxation and the extent of his right to have assistance in relation thereto. Examination of all legislation in pari materia affords light on the question as to what it may reasonably be supposed the Legislature intended the Director might do in the administration of his responsibilities through agents rather than solely in propria persona.
We find only these express provisions concerning appointment or designation of assistants or deputies generally. R.S. 54:1-8 empowers the commissioner (now Director) to appoint such "clerical, technical and other assistants as may be necessary and prescribe their duties." R.S. 54:1-11 provides that when the Director "is unable to perform any one or more of his public duties, through sickness, absence from his office, pressure of other public business, temporary inability to act or any other cause" he may designate a deputy or deputies to perform any or all of his duties in his stead upon filing a certificate to that effect with the secretary of state. R.S. 54:1-12 authorizes the Director to establish and reorganize "divisions" of the department. These sections clearly do not on their face contemplate the permanent delegation by the Director of regular and continuous responsibility for performance of any particular area of the Director's functions. Cf. Horsman Dolls v. State Unemployment Compensation Com., 134 N.J.L. 77 (E. & A. 1946).
Except for certain isolated situations, there are no statutes expressly authorizing delegation by the Director of any of his *176 discretionary or quasi-judicial statutory duties or powers. One such exception is the Railroad Tax Act, which authorizes the Director to delegate to any officer or employee of his department "power to appraise and assess any or all property in railroad use." N.J.S.A. 54:29A-5. Another is R.S. 54:34-6, which authorizes the Director to appoint appraisers to value the property of decedents under the Transfer Inheritance Tax Act. However, the Director is enjoined to make the actual assessment. R.S. 54:34-12. See also R.S. 54:1-12 and 54:50-2, 3. But the great bulk of the statutory administrative functions of the Director are specified to be performed by him without any express authorization of power to delegate any of the manifold types of discretionary or quasi-judicial (in the sense of nonministerial) duties involved. Illustrative are such duties and powers, all specifically imposed by the statutes upon the Director himself, as assessment and taxation of motor fuels, billboards and outdoor advertising, cigarettes, alcoholic beverages, public utilities (and apportionment of the proceeds thereof), decedent's estates, insurers, financial businesses and general corporations; investigation of irregularities or inequalities in local real estate assessments and ordering the increase, decrease or equalization of such assessments when required after investigation; and preparation of tables of equalized valuations of assessed real estate for every municipality in the State for purposes of state school aid distribution, showing separate ratios of assessed to true values, a process which involves analysis and classification of every recorded sale of real property which takes place in the State (about 200,000 annually). See Bayonne v. Division of Tax Appeals, 49 N.J. Super. 230 (App. Div. 1958).
The administrative duties involved in this complex of functions include valuation, assessment, jeopardy assessment, collection, remission or compromise of taxes or penalties, promulgation of rules and regulations, suspension and revocation of licenses in certain cases, determinations as to exemptions from taxation, determinations as to transfers in *177 contemplation of death (estate and transfer inheritance taxes), and miscellaneous others.
If the Director may not delegate any of his nonministerial functions under the Corporation Business Tax Act because of absence of express authority therein, then it follows he may not do so under any of the other statutes imposing upon him the manifold duties and functions mentioned above, practically all of such legislation being equally devoid of express authority of delegation. That hypothesis obviously postulates a legislative intention that the Director do the impossible, since the aggregate number of transactions involving the performance of nonministerial functions in the administration of all these statutes, even excluding those few where there is express authorization for delegation, partial or total, runs into the scores of thousands. Under the Corporation Business Tax Act alone, some 70,000 corporate returns require annual auditing and the making of the kinds of determinations illustrated by the disputes in this case.
This court will take judicial notice that a Corporation Tax Bureau in the Division of Taxation has administered the Corporation Business Tax Act since the inception of that tax, just as such a bureau in predecessor state tax departments administered the previous corporation franchise tax act, taxing outstanding capital stock, for many years previously, notwithstanding such an agency was never mentioned in any statute providing for such taxes. Presumably, the Legislature has continuously known of the practice and by its failure to veto it has acquiesced therein, consented thereto, and impliedly authorized its continuance in the administration of the Corporation Business Tax Act.
We thus conclude that there is implied power in the Director to delegate to such an agency as the Corporation Tax Bureau the authority that agency exercised under his aegis to make the reassessment complained of in this case. Cf. Cammarata v. Essex County Park Comm'n, 26 N.J. 404, 411 (1958). Macy does not contend that in fact such delegation *178 has not occurred or that the activities of the Corporation Tax Bureau do not have the full approval of the Director.

VI. VAGUENESS OF STANDARD
The attack here is upon the allegedly "unbridled discretion" for redetermination vested by section 54:10A-4 in the Director constituted by the criteria that "in the opinion of the [Director], the corporation's books do not disclose fair valuations" and "determination of the net worth which, in his opinion, would reflect the fair value of the assets" etc.
We have already in (I), above, dealt with the terms "fair valuations" and "fair value" from the standpoint of alleged vagueness of standards, and found that they had sufficient specificity of meaning, in the context of the section where found and the act as a whole, to be validly applicable to the dispute as to inventories. We conclude to the same effect in relation to the other asset items in contest discussed above.
Macy concentrates upon the statutory incorporation of the "opinion" of the Director in the criterion for redetermination as condemning the standard for vagueness. We cannot agree, notwithstanding the reliance upon Abelson's Inc. v. N.J. State Board of Optometrists, 5 N.J. 412 (1950). The obvious and sensibly deduced meaning of section 54:10A-4(d) is that if in the reasonable opinion of the Director the books do not disclose fair valuations he may make a determination of net worth which in his reasonable opinion reflects the fair value of the assets in accordance with sound accounting principles. The intended criterion, it is clear to us, is the reasonable judgment of an administrator making an objective judgment in the matter, anchored by the further qualification of consistency with sound accounting principles. We regard the Abelson's case, supra, as only superficially analogous to the issue here involved. The respective standards in the two cases, taken in entirety, are materially different, and the application of the standard in Abelson's was in a penal setting. The decision is not controlling *179 in the present instance. Compare with the statute sub judice the Internal Revenue Code of 1954, § 471 (26 U.S.C.A. § 471).
We find no unconstitutional vagueness in the standards of the act before us. Cf. Oxford v. Macon Telegraph Publishing Company, 104 Ga. App. 788, 123 S.E.2d 277 (Ct. App. 1961).

VII. DISCRIMINATION
Macy contends that it has been discriminated against in that other competitive department stores applying the Lifo method in inventory accounting without indicating their Fifo differences were not subjected to readjustment of their inventory figures, and that efforts to prove this at the hearing were rebuffed upon objection. However, there was no claim of discriminatory assessment in the petition of appeal to the Division of Tax Appeals. Such a charge would open up a broad range of factual controversy, and, accordingly, of pertinent proofs, both affirmative and defensive, since an assertion of discriminatory assessment requires proof of a deliberate or systematic scheme or plan to subject one or more taxpayers to a more onerous burden than that being applied to the generality of taxpayers. Jat Company, Inc. v. Division of Tax Appeals, 47 N.J. Super. 571 (App. Div. 1957), certification denied 27 N.J. 278 (1958). Introduction of such an issue in the case required pleading it before the Division so that the State might be prepared to meet it. This not having been done, the question of the comparative tax practices of other corporations or their treatment by the Division of Taxation was, as correctly decided below, irrelevant.

VIII. ADMINISTRATIVE RULE-MAKING BY ADJUDICATION
Macy contends that the Director's ruling as to valuation of inventories in this case constitutes the impermissible process of administrative rule-making by ad hoc adjudication of a particular case rather than through the promulgation of general rules and regulations pursuant to N.J.S.A. *180 54:10A-27. Here, again, Macy raises a contention not adduced in its petition of appeal before the Division of Tax Appeals in such manner as would have permitted the submission of proofs which might cast light on the reasonableness of the Director's proceeding in this area by ruling on the particular tax return before him rather than by promulgation of a general rule in advance.
In any event, insofar as the argument before us is premised on the position that the Division of Taxation was powerless to exercise its statutory power to determine fair valuations of Macy's inventories as assets, in accordance with sound accounting principles, without first adopting a general rule that all department stores must report and are to be taxed on the base of Fifo inventories, the contention is without merit. First, without more evidence, we cannot say that such a rule of unvarying application in all such cases would necessarily be appropriate. Second, and more important, there is, as we have decided, an adequate legislative standard in this act for administrative guidance, and in such case the development of subsidiary rules and principles on a case by case basis is not proscribed. See 2 Davis, Administrative Law Treatise (1958), § 17.08, pp. 533-538, commenting on Securities and Exchange Com. v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). Compare a situation involving absence of both statutory and administrative standards and an attempt nevertheless to proceed administratively by ad hoc ruling. Boller Beverages, Inc. v. Davis, 38 N.J. 138 (1962). The dictum in Mitchell v. Cavicchia, 29 N.J. Super. 11, 15 (App. Div. 1953), is not against the position of the Director. Moreover, it was there said (at p. 14): "there is no rigid principle requiring an administrative agency to lay down rules and standards spelling out every wide grant of authority it receives." This precept is peculiarly apposite to taxing statutes which traditionally and commonly employ valuation standards even broader than those fixed by the tax act here involved.
Judgment affirmed.