87 N.J. Super. 1 (1965)
207 A.2d 699
AMERICAN CAN COMPANY, A NEW JERSEY CORPORATION, APPELLANT,
v.
DIRECTOR OF THE DIVISION OF TAXATION, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 11, 1965.
Decided March 1, 1965.
*3 Before Judges CONFORD, KILKENNY and LEWIS.
Mr. William D. Hardin argued the cause for appellant (Messrs. Pitney, Hardin & Kipp, attorneys; Mr. James J. Petrella, on the brief).
Mr. Alan B. Handler, First Assistant Attorney General, argued the cause for respondent (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by CONFORD, S.J.A.D.
This is an appeal by American Can Company ("American Can," or "taxpayer," hereinafter) from a judgment of the Division of Tax Appeals sustaining as valid a redetermination by the Corporation Tax Bureau of the State Division of Taxation, on behalf of the Director thereof, of taxpayer's franchise tax liability for the privilege year 1959 (as of December 31, 1958), incurred pursuant to the Corporation Business Tax Act (1945), N.J.S.A. 54:10A-1 et seq. Of the additional tax of $5,678.80 thus assessed, this appeal *4 involves only the sum of $4,215.57, which was attributable to the addition by the Director to the taxpayer's reported net worth of a $20,300,001 "reserve for deferred income taxes" (for the corporation and its covered subsidiaries), shown on the taxpayer's books as a liability. The action of the Corporation Tax Bureau was stated as follows: "Reserve for Deferred Income Taxes is deemed to be a surplus reserve and includible in net worth for franchise tax purposes."
The reserve in question arises from the following circumstances. As permitted by section 167(b) of the Internal Revenue Code of 1954 (and similar provisions of Canadian income tax laws), American Can and certain of its subsidiaries had, for income tax purposes only, been using accelerated methods of depreciation of machinery and equipment. At the same time, as permitted by the Internal Revenue Service (Rev. Rul. 59-389, 1959-2 Cum. Bull. 89), the company had used normal straight-line methods of depreciation for general reporting purposes on its books of account. In the normal course of events, and other factors being equal, accelerated depreciation for income tax purposes results in abnormal reductions of income taxes during the early portion of the depreciable life of an asset but in abnormal increases of such taxes in the later portion thereof because the asset then permits of less than normal depreciation in consequence of the excessive depreciation taken in the earlier period.
The uncontradicted expert accountancy testimony in this case is to the effect that a corporation taking accelerated depreciation for income tax purposes but at the same time straight-line depreciation for purposes of general reporting on its books of account, must, under generally accepted accounting practices, show a reserve on the liabilities side of the balance sheet for the presumptive deferred income taxes mentioned above. The reserve disputed in this case was such a reserve, set up on the liabilities side of the general books of account of American Can as of the close of the calendar year 1958 at the direction of Lybrand, Ross Brothers and *5 Montgomery, independent auditors of the corporation. It was calculated, as concededly normal accounting practice then required, by taking 52% of the total amount of difference between depreciation expense based upon accelerated depreciation and depreciation expense based upon straight-line depreciation, the 52% rate being the then current total income tax rate applicable to the corporation's net income. Walter R. Staub, partner of the Lybrand firm in charge of the American Can account, testified that such a reserve is necessary for "a fair matching of costs and revenues in accepted accounting principles"; that without it he could not have given a "clean opinion" on the audit, i.e., "without qualification as to acceptability of the accounting principles followed in their preparation"; and that the item cannot be included in net worth in the guise of a surplus reserve or otherwise without violation of such principles. He further testified that both the standards of the American Institute of Accountants and the regulations of the Securities and Exchange Commission require the exclusion of such an item from net worth in a corporate balance sheet, either by a reserve on the liability side, as on the instant American Can balance sheet, or by additional depreciation reserves on the asset side.
Arthur F. Wilkins, a certified public accountant associated with Haskins & Sells, testified essentially in support of the conclusions and opinions given by Staub. There was no contradiction of that testimony by either of the witnesses for the Director of the Division of Taxation. There can be not the slightest doubt of the correctness of the accounting principles enunciated by the taxpayer's witnesses, in terms of generally accepted accounting principles and practice, in relation to the specific treatment by American Can of the reserve for deferred income taxes on its December 31, 1958 balance sheet. See Accounting Research Bulletin No. 44 (Revised) of American Institute of Accountants (July 1958); Supplementary Letter of August 1959; Securities and Exchange Commission, Accounting *6 Series Release No. 85 (February 29, 1960)[1]; Amory and Hardee, Materials on Accounting (3d ed., Herwitz and Trautman 1959), pp. 261-270.
A representative of the Corporation Tax Bureau, not qualified as an accountant, explained its transfer of the American Can reserve for deferred taxes to net worth as a "surplus reserve" as follows: "The Bureau made the redetermination with what we feel is sound accounting, by merely considering the reserve as set up to be not a liability, not a true liability, and, at best, a contingent liability which will not be paid out within any immediate foreseeable future." The witness conceded on cross-examination that the State's treatment of the reserve was contrary to the policy of the American Institute of Accountants as formalized in its Accounting Research Bulletin No. 44 (Revised), supra.[2] The Institute's Supplementary Letter, supra, interpreting that Bulletin, states: "A provision in recognition of the deferral of income taxes, being *7 required for the proper determination of net income, should not at the same time result in a credit to earned surplus or to any other account included in the stockholders' equity section of the balance sheet." The Bulletin as a whole indicates that simultaneous use of accelerated depreciation for income tax purposes and straight line depreciation for ordinary financial reporting constitutes a typical situation requiring creation of the "provision in recognition of the deferral of income taxes" mentioned.
The argument in defense of the State's treatment of the disputed reserve for franchise tax purposes submitted on this appeal is essentially as follows. There was no fixed liability as of December 31, 1958 for the projected future income taxes supporting the deferral reserve. The fact or amount of such future taxes was conjectural and uncertain, depending upon such unknown factors as continuation unchanged of existing federal income tax laws and rates; the earning by the company of a net profit in future years; absence of later enlargement, by additions, of the company's depreciable plant, since such growth would postpone, perhaps indefinitely, the anticipated later loss of normal asset depreciation because accelerated depreciation on newly added plant would replace anticipated fall-off of depreciation on older assets (described as "rollover" by the taxpayer's experts); and the like. In the meantime, argues the State, the taxpayer has completely unrestricted use of the funds represented by the "reserve." Were the corporation to have liquidated on December 31, 1958, the whole reserve would be equity capital, free of any federal tax claim, and available for distribution to stockholders.
Resolution of the controversy before us calls for close attention to the statute, its history and rationale and the interpretive decisions.
N.J.S.A. 54:10A-5 imposes a state franchise tax computed upon that portion of the "entire net worth" of the corporation allocable to this State, multiplied by the applicable rates. N.J.S.A. 54:10A-4 defines "net worth" as follows:
*8 "(d) `Net worth' shall mean the aggregate of the values disclosed by the books of the corporation for (1) issued and outstanding capital stock, (2) paid-in or capital surplus, (3) earned surplus and undivided profits, (4) surplus reserves which can reasonably be expected to accrue to holders or owners of equitable shares, not including reasonable valuation reserves, such as reserves for depreciation or obsolescence or depletion, and (5) the amount of all indebtedness owing directly or indirectly to holders of 10% or more of the aggregate outstanding shares of the taxpayer's capital stock of all classes, as of the close of a calendar or fiscal year. However, if in the opinion of the commissioner, the corporation's books do not disclose fair valuations the commissioner may make a reasonable determination of the net worth which, in his opinion, would reflect the fair value of the assets carried on the books of the corporation, in accordance with sound accounting principles, and such determination shall be used as net worth for the purpose of this act." (Emphasis added)
The act was changed in certain respects, effective beginning with the year 1959, L. 1958, c. 63, but the definition of "net worth" was not altered.
The object and background of this tax statute, as enacted in 1945 as the Corporation Business Tax Act (1945) (L. 1945, c. 162), have been fully detailed in United States Steel Corp. v. Director, Div. of Tax., 38 N.J. 533, 539-541 (1962); R.H. Macy & Co., Inc. v. Director, Div. of Taxation, 77 N.J. Super. 155, 165-167 (App. Div. 1962), affirmed o.b. 41 N.J. 3 (1963) (hereinafter referred to as "Macy"). We pointed out in Macy, after considering the legislative history of the statute: (77 N.J. Super., at pp. 166-167)
"From a consideration of all the foregoing, it is apparent that as finally enacted and as the act stood in relation to the tax years in question, the Legislature was concerned with providing a relatively simple and administratively feasible formula for measuring the value of the exercise of the corporate privilege in this State. It chose to do so by using basically the taxpayer's net book worth rather than becoming enmeshed in the complexities and administrative difficulties attendant upon true value or market value appraisal of assets for that purpose, a technique more characteristic of ad valorem property taxation than of franchise taxation."
The key to the determination of the present case is the proper significance to be accorded the statutory language, "in accordance with sound accounting principles," as employed *9 in the authorization by N.J.S.A. 54:10A-4 for the Commissioner (now the Director, Division of Taxation) to make a "reasonable determination of the net worth which, in his opinion,[3] would reflect the fair value of the assets carried on the books of the corporation, in accordance with sound accounting principles."
In Macy we stated, in reference to the foregoing (77 N.J. Super., at p. 167):
"* * * the face of section 54:10A-4 conveys the thought that the net worth of the assets appearing on the books of a particular corporate taxpayer may represent something other than `fair valuations' thereof, and that the Tax Director may in such case, in assessing the franchise tax, revise the book figures to reflect `fair value of the assets,' providing, however, that his resulting readjustment of the figures is `in accordance with sound accounting principles.'" (Emphasis added)
Examples (by no means exhaustive) of what the Director might properly do in the exercise of his powers consistently with the restrictive anchor of adherence to sound accounting principles are afforded by the Macy case. For one thing, we there held that the Director might re-evaluate the inventory of a department store by using the "Fifo" rather than the "Lifo" method of costing inventory valuations. The valuation justification for the Director's action there approved was that Fifo produced inventory costs more nearly proximate to the assessing date than did Lifo. But we were at pains to point out that the use of either the Fifo or Lifo method was consistent with sound accounting principles under the expert proofs in that case. (77 N.J. Super., at pp. 163, 170.) It was implicit in the Macy opinion, however, that since proper accounting practice would require the corporation to adhere to whichever method it employed, Lifo or Fifo, over certain periods of time, the Director, also, in auditing returns of the corporation for franchise tax purposes, would, if he elected to *10 substitute Fifo for Lifo methods of valuing inventory, be likewise required to adhere to Fifo for such periods of time as required by sound accounting practice. He would be precluded from jumping at will in successive franchise tax years from Lifo to Fifo for a given taxpayer since sound accounting practice, in the sense of generally accepted accounting principles, would preclude the corporation itself from doing so.
So, too, in Macy, we upheld the Director's right to revise downward the taxpayer's book reserve for bad debts, finding the amount determined for this purpose by the Director to be reasonable, "consistent with sound accounting principles." (77 N.J. Super., at p. 172). Generally accepted accounting practice permitted a reserve for bad debts, but did not provide any fixed formula for determination of the amount thereof. Certain relevant guiding criteria were recognized, but the judgment of the Director as to the proper amount of the reserve, if not arbitrary, could be substituted for that of the corporation, entirely consistently with sound accounting principles. Ibid. By contrast, there is no dissent in the present case that proper accounting practice, in setting up a reserve for deferred taxes because of general purpose accounting on a straight-line depreciation basis contemporaneous with computation of income taxes by use of accelerated depreciation, requires the fixing of the amount of the reserve at the tax dollar (income tax) saving produced by applying the current income tax rate against the gross difference in depreciation reflected by the respective different depreciation rate schedules. What the Director contends for here is his right to eliminate the entire deferred tax reserve from the liability side of the corporate balance sheet and to incorporate it into surplus, thereby enlarging net worth. That this is proscribed by generally accepted accounting principles, and was, as of December 31, 1958, is indubitable from the record of this case.
We pause to point out that the testimony of an independent certified public accountant produced by the State before the Division of Tax Appeals does not help the Director's position. This expert conceded that what the Director *11 had here done could not be defended under "generally accepted accounting principles," but he attempted to formulate a distinction between that concept and that of "sound accounting principles." The latter concept, he testified, would justify placing the reserve here involved in net worth if one were preparing a financial statement for purposes of liquidation of the corporation or sale of its assets. It is obvious, however, that a financial statement for such a special purpose is totally irrelevant to the status of a going corporation for purposes of administering a franchise tax statute  one which taxes the benefit of exercise in this State of the corporate franchise for the privilege year succeeding the assessing date as of which the net worth is taken from the books of the corporation. See United States Steel Corp. v. Director, Div. of Tax., supra (38 N.J., at pp. 540-541). The State has not relied on that purported distinction by its expert on this appeal.
In any event, we entertain no doubt that the statutory phrase, "sound accounting principles," is and was intended to be substantially synonymous with "generally accepted accounting principles," the term generally used by the accounting profession. See Wixon and Cox, Principles of Accounting (1961), pp. 5-6.[4] We so assumed in the Macy case. The State has not argued the contrary on this appeal.
Rather, the State's emphasis on this appeal is that the term, "in accordance with sound accounting principles," is to be interpreted "within the meaning and intendment of the Corporation Business Tax Act." With that general proposition one must agree. Indeed, all statutory language must be read and understood in the light of the purposes and objects of the particular statute. Thus, for example, an argument purportedly geared to sound accounting principles would not be permitted to sanction the result of total avoidance of the tax for a given year in respect of subsidiaries merged into the *12 corporation at midnight of the last day of the base year. United States Steel Corp. v. Director, Div. of Tax., supra (38 N.J., at p. 537).
As to the argument that adherence by the taxpayer's books to sound accounting principles does not necessarily insulate the net worth reflected thereby from redetermination by the Director, that proposition is, of course, the lesson of Macy. But the State fails to present a tangible rational reason why we should not here, as we recognized as necessary in Macy, impose the limitation plainly written into the statute that any redetermination of net worth by the Director must of itself pass muster as comporting with sound accounting principles in the sense that the accounting profession would understand that term. In the name of interpretation "for purposes of the act" we are here asked, in effect, to ignore a plain, unambiguous and express proviso of the statute. And this for no other reason than that the Director regards a deferred tax reserve, which sound accounting practice requires to be reflected in the balance sheet lest a corporation present a misleading picture of its financial posture, as merely contingent.
As to the contingency of the reserve, or the degree thereof, the Director may or may not be theoretically correct were we permitted to examine that concept a priori and free from the restrictions of the statute. But in terms of whether any such contingency permitted the Director's relegation of the reserve to surplus, so as to incorporate it into the taxable net worth base, it is entirely logical to deduce from the statutory language that the Legislature preferred to make the matter depend on the objective criterion of the consistency of such action with sound accounting principles rather than to inject it into the area of technical litigation over contingency. Presumably there might be little or no element of contingency in such a reserve in the case of some taxpayers. Exploration of all the relevant facts (which did not take place at the hearing in the present matter) might frequently require hearings of a length and complexity which it may well be inferred the Legislature *13 intended to avoid when it devised what it considered to be a "relatively simple and administratively feasible formula for measuring the value of the exercise of the corporate privilege in this State." See Macy, supra (77 N.J. Super., at p. 167). Moreover, in the light of the statute, once it were determined that placing the instant reserve in surplus would offend the relevant settled sound accounting principle it would be quite inappropriate for the court to entertain any debate as to the merits (in an accounting sense) of the particular accounting principle implicated.
We deem applicable here, as did the Supreme Court in relation to interpretation of the same tax statute in another regard, the principle that "In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, and in favor of the citizen." Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 528-529 (1964), quoting Gould v. Gould, 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211 (1917); see also National Tube Co. v. Peck, 159 Ohio St. 98, 111 N.E.2d 11 (Sup. Ct. 1953).
There is some judicial authority bearing upon the problem here under consideration, but none that is cogent in the light of the nature and the specific text of the statute before us. Perhaps the closest case is McLouth Steel Corporation v. State, 372 Mich. 76, 124 N.W.2d 900 (Sup. Ct. 1963). There an equally divided court affirmed a trial court determination, in a corporate franchise tax case, that a reserve for deferred income taxes (created under the same circumstances as here) was not includible within the statutory definition of surplus. The holding was the same for the ensuing two tax years wherein the same result was accomplished on the taxpayer's books by treating the questioned item as a deduction from assets in the nature of a valuation reserve. But the Michigan tax statute was devoid of the New Jersey criterion *14 of "sound accounting principles," and, in disapproving the trial determination, an opinion for four of the Justices significantly stated:
"We are not concerned here with whether or not what was done was a sound accounting practice or good business. Even if this was good accounting or good business, it did not turn this `reserve' into an `outstanding indebtedness' and thereby remove this item from the statutory definition of `surplus.' The record indicates this item belongs to McLouth steel corporation, and is an asset unencumbered by any present lien or obligation. If the corporation were to be dissolved today, clearly this item would be `surplus' as defined by the privilege fee statute." (124 N.W.2d, at p. 906; emphasis added)
In sustaining the result, although not the reasoning of the trial court, three of the Justices said:
"Plaintiff's response to the above is that it is not merely a matter of contingency or of what may happen in the future; that consideration must be given to what already has happened; that under the accelerated method there has been a depletion of the facilities' value as an income tax deduction factor, in excess of that which would have occurred had the straight-line system been employed, leaving the facilities correspondingly of less value; that that decrease in value as an income tax reducer must be reflected in the picture of assets, including surplus, upon which the privilege tax is to be determined. Accordingly, plaintiff contends that, inasmuch as the Federal corporation income tax rate is 52%, an amount equal to 52% of the difference between straight-line and accelerated depreciation for a given year, which is, of course, the amount of the income tax savings realized during that year under the accelerated method, must be deducted from the value of the facilities in question, in order to determine the amount of plaintiff's surplus to be assessed for the privilege fee. This presents a question of fact as to the value of facilities included in the surplus item. Expert testimony of certified public accountants, who testified in the case, supports and confirms plaintiff's position in this respect, not only as to its conformance with sound accountancy practice but also as being correct as a matter of fact. We think it is sound and correct. For that reason it should be held that the items in question are properly deducted from the value of the facilities in question, are not a part of surplus, not subject to imposition of the privilege fee, and that, therefore, the court of claims' judgments for plaintiff should be affirmed." (Id., at pp. 908-909)[5]
*15 It may be observed that the foregoing reasoning accords with alternate theoretical accounting justification for excluding such an item from surplus or stockholders' equity advanced by the experts for the taxpayer in the instant case.
A majority of the same court held that in assessing the franchise tax against a public utility the deferred tax reserve could not be included in surplus for the reason that the corporation's bookkeeping was controlled by the state utilities commission which forbade it. Detroit Edison Company v. State, 367 Mich. 104, 116 N.W.2d 194 (Sup. Ct. 1962). The dissenters relied on the argument that the item was not currently owing to the Internal Revenue Service; and see Detroit Edison Company v. Michigan Corp. & Sec. Com'n, 361 Mich. 150, 105 N.W.2d 110 (Sup. Ct. 1960).
A Texas court, also dealing with a franchise tax statute which did not in its definition of the tax base mention sound principles of accounting, held that accounts for accumulated deferred federal income taxes arising out of accelerated amortization and depreciation taken simultaneously with straight-line depreciation on the general books of account were not includible in surplus. Calvert v. Houston Lighting & Power Company, 369 S.W.2d 502 (Tex. Civ. App. 1963). All the expert testimony in the case supported the taxpayer's position; the statutory tax base was "stated capital, surplus and undivided profits." It was held that the fact that the deferral of taxes constituted, in effect, an "interest free loan" from the federal government could not convert the account to surplus. Compare the contrary result on statutory language much more adverse to the taxpayer in Trunkline Gas Company v. Mississippi State Tax Com'n, 238 Miss. 591, 119 So.2d 378 (Sup. Ct. 1960).
A number of court decisions have had to do with the accounting treatment of the same type of reserves for tax deferrals of public utilities in relation to fixing a rate base or the calculation of earnings of such a public utility for rate-fixing purposes. These cases furnish no guidance in respect of a franchise tax problem such as here presented, since altogether *16 different policy factors are involved in rate-making; moreover, the specific tie to "sound accounting principles" in the instant tax statute is not necessarily implicated in such decisions. See, e.g., In re Hackensack Water Co., 57 N.J. Super. 180, 194-5 (App. Div. 1959) (permitting the treatment of the "deferred taxes" as a current expense for purposes of determining sufficiency of utility earnings), affirmed on this point, modified on other grounds, 35 N.J. 239 (1961); Panhandle Eastern Pipe Line Co. v. Federal Power Com'n, 115 U.S. App. D.C. 8, 316 F.2d 659 (D.C. Cir. 1963), certiorari denied 375 U.S. 881, 84 S.Ct. 147, 11 L.Ed.2d 111 (1963); City of Pittsburgh v. Pennsylvania Public Util. Com'n, 182 Pa. Super. 551, 128 A.2d 372 (Super. Ct. 1956); Cincinnati Gas & Electric Co. v. Public Utilities Com'n, 173 Ohio St. 473, 184 N.E.2d 84 (Sup. Ct. 1962); City of Alton v. Commerce Commission, 19 Ill.2d 76, 165 N.E.2d 513 (Sup. Ct. 1960): City of Alton v. Alton Water Company, 25 Ill.2d 112, 182 N.E.2d 665 (Sup. Ct. 1962); Central Maine Power Co. v. Public Utilities Com'n., 153 Me. 228, 136 A.2d 726 (Sup. Jud. Ct. 1957).
It is our considered judgment that in the case before us the Division of Tax Appeals erred in approving the action of the Director in transferring the income tax deferral reserve under discussion to net worth since so doing was not in accordance with sound accounting principles within the intended meaning of the franchise tax statute.
Judgment reversed.
NOTES
[1] This release announced that "* * * any financial statement filed with this Commission which designates as earned surplus (or its equivalent) or in any manner as a part of equity capital (even though accompanied by words of limitation such as `restricted' or `appropriated') the accumulated credit arising from accounting for reductions in income taxes resulting from deducting costs for income tax purposes at a more rapid rate than for financial statement purposes will be presumed by the Commission to be misleading or inaccurate despite disclosure contained in the certificate of the accountant or in footnotes to the statements, provided the amounts involved are material."
[2] The Bulletin is headed: "Declining Balance Depreciation," the most common form of accelerated depreciation recognized for income taxes under the Internal Revenue Code of 1954.

The original Accounting Research Bulletin No. 44, issued October 1954, made accounting recognition for deferred income taxes (in such situations as the present) permissive rather than mandatory. It stated that the item "need not be recognized in the accounts unless it is reasonably certain that the reduction in taxes during the earlier years * * * is merely a deferment of income taxes until a relatively few years later, and then only if the amounts are clearly material."
However, the prevailing view in the American Institute of Accountants even prior to issuance of Revised Bulletin No. 44 in 1958 seems to have favored the setting up of the reserve for deferred taxes. See the Special Report of the Institute's Committee on Relations with the Interstate Commerce Commission of March 1957, partly printed in Amory and Hardee, Materials on Accounting, supra, at pp. 262-9.
[3] Meaning "reasonable opinion," see Macy, 77 N.J. Super., at p. 178.
[4] "The users of general-purpose financial statements, realizing that such statements have been prepared from records kept in accordance with generally accepted principles, may place greater reliance upon such statements than would otherwise be possible." Id., at p. 6.
[5] The eighth Justice in McLouth affirmed on the ground taken by the trial judge, i.e., that in the absence of fraud or mistake the taxpayer's books were conclusive on the State. (Id., at pp. 909-11)