**Edna M. HOOVER and Mercantile Bank and Trust Company, Co-Executors of the Estate of James G. Hoover, Deceased, Plaintiffs-Cross-Appellants,**

v.

**PAR ELECTRICAL CONTRACTORS, INC., Robert E. Payton and Betty A. Payton, Defendants-Appellants.**

**No. WD 30705**

Missouri Court of Appeals, Western District.

April 7, 1980.

Rehearing Denied June 9, 1980.

Donald F. Bayer, Hoskins, King, McGannon, Hahn & Hurwitz, Kansas City, for plaintiffs-cross-appellants.

Wm. Harrison Norton, Norton & Pollard, Inc., Kansas City, for defendants-appellants.

Before TURNAGE, P. J., and SHANGLER and MANFORD, JJ.

MANFORD, Judge.

This is an action upon a promissory note and guaranty statement. The case was tried to the court. Both parties requested findings of facts and conclusions of law. Judgment was entered for plaintiffs in the sum of $42,251.00 and costs. Cross-appeals were filed. The judgment is affirmed.

Cross-appeals have been filed. For purposes of clarity, the parties are referred to herein as plaintiffs and defendants. The plaintiffs are Edna M. Hoover and Mercantile Bank and Trust Company, co-executors of the estate of James G. Hoover. The defendants are Par Electrical Contractors, Inc., Robert E. Payton and Betty Payton.

Prior to this litigation, James G. Hoover was declared incompetent. An estate had been established to administer his affairs. Mr. Hoover died and plaintiffs were appointed co-executors of the decedent's estate. Prior to his death, Mr. Hoover owned 993 shares of the total outstanding shares

(1,000) of the Federal Construction Corporation. Under approval of the Probate Court, plaintiffs acquired the remaining outstanding seven shares of Federal Construction Corporation. There is no dispute that plaintiffs were owners of the shares and assets of Federal and possessed the capacity to sell.

Negotiations for the sale/purchase of the stock and notes of the Federal Construction Corporation culminated in the execution of a purchase agreement, promissory note and guaranty statement, with the effective date of December 29, 1972. Portions of the purchase agreement pertinent to this appeal are:

(a) purchase price of $65,000, payable as $5,000 cash at the closing of the agreement and the balance as represented by a promissory note for $60,000 payable in four annual installments of

| 1–15–74 | $ 7,500.00 | |
| 1–15–75 | 10,000.00 | |
| 1–15–76 | 10,000.00 | |
| 1–15–77 | 32,500.00 | (subject to adjustment) |

The note, which bears interest at the rate of 6% per annum, provided for the full amount due and payable upon default at the option of the holder and for the payment of reasonable attorney fees upon enforcement of collections.[1]

(b) purchaser to receive all of the issued shares of common capital stock of Federal Construction Corporation.[2]

(c) purchaser to receive two negotiable promissory notes, held by seller as a holder in due course, in total sum of $65,000.00.

The purchase agreement contained other provisions, and in addition to the above terms, there remains one other pertinent portion needful of consideration on this appeal. This provision is sub-paragraph (a) of paragraph (2), which reads as follows:

"(a) The purchase price shall be reduced in the amount equal to the net amount of any liabilities of the Company not disclosed on the October 31, 1972 unaudited financial report of the Company attached hereto as Exhibit A, but subsequently disclosed upon full audit of the Company's books as of December 31, 1972, and shall also be reduced by the net amount of any adjustments which should have, in accordance with sound accounting principles have [sic] been made to the Company's financial statement as of October 31, 1972."

No payment on the note was made pursuant to the terms and no payment has been made by the buyers (defendants). After notice and demand for payment, this suit followed.

Cross-appeals have been filed, so the points of error alleged have been set forth with reference to the party presenting the contending error.

Defendants allege the trial court erred in entering judgment for plaintiffs upon an erroneous conclusion, as a matter of law, that the parties did not intend that the adjustments to equipment depreciation in the audited statement would reduce the purchase price. They also allege the trial court erred in concluding, as a matter of law, that adjustments to equipment depreciation should not go to the reduction of the purchase price.

In addition to their response to defendants' alleged errors, the plaintiffs charged the trial court erred in its failure to enter judgment for the full amount sought in that the trial court's conclusion of law no. 3, holding that the parties intended adjustments to inventory valuation would reduce the purchase price, was against the weight of the evidence. This first alleged error was further subpointed, alleging the evidence showed the parties did not intend that such inventory valuation adjustment would affect the purchase price. By the conduct of the parties subsequent to the

---

1. The maker of said note was defendant Par Electrical Contractors, Inc. The note was guaranteed by a separate guaranty statement executed by defendants Robert Payton and Betty Payton.

2. Said stock had no par value but was declared to have an aggregate stated value of $100,000. Total number of shares was 1,000.

execution of the agreement, the evidence shows they did not intend that such adjustment would affect the purchase price, and there was no evidence exhibiting an intention that a change in the method of inventory valuation was to affect the purchase price.

Plaintiffs further allege the trial court erred in failing to enter judgment for the full amount prayed and in contravention of Missouri law, the court failed to give specific wording within the purchase agreement its plain meaning.

Defendants responded by way of a reply brief, arguing that the agreement language reflects the parties intended that adjustment to inventory would reduce the purchase price, and that the court did not err in holding the unaudited statement of October 31, 1972 did not conform to sound accounting principles. Therefore, they argue, the inventory adjustment valuation from cost to market in the later audited statement was in conformity with sound accounting principles.

While the facts leading to this litigation were quite simple as referred to previously, the disposition of this appeal encounters the controversy over interpretation of subparagraph 2(a) above relative to certain accounting procedures employed and in turn, how such procedures reflect upon the intention of the parties to reduce the original purchase price.

Plaintiffs had the capacity to offer for sale the stock and notes of the Federal Construction Corporation.[3] Negotiations between the parties commenced sometime in late November of 1972. These negotiations ended in the execution of the purchase agreement, note and guaranty statement with the effective date of December 29, 1972.

In addition to documentary evidence of the agreement, note and the guaranty statement, plaintiffs' evidence included the testimony of three witnesses. Plaintiffs'

first witness was attorney Robert Jackson, who testified to the drafting of the purchase agreement, note and guaranty and that he attended the sale negotiation meetings. Mr. Jackson stated defendants expressed no desire to purchase the assets, but were only interested in the stocks and notes of Federal. Mr. Jackson also testified that defendants saw the books and viewed the equipment and inventory of Federal. He also stated that at one meeting, defendants discussed the inventory of Federal. He said that defendants' intention, or at least one intention, was to take advantage of the net operating loss of Federal. The intended use was a carry-forward of that net operating loss for use by defendant Par Electrical Contractors, Inc.[4] for tax purposes. This witness testified that the net loss was discussed by defendants.

The second witness for plaintiffs was James McManus, an independent Certified Public Accountant, who testified he had been the accountant for Federal for a number of years. This witness testified he prepared the audited statement (year end) for Federal for the year 1971, the unaudited statement of October 31, 1972 and the audited statement of December 31, 1972. As will be seen, these three documents, along with the testimony of witnesses relative to these documents, go to the crux of the issues on this appeal.

Witness McManus testified he attended at least one negotiation meeting and did not recall any discussion regarding inventory valuation or equipment depreciation. He stated the unaudited report of October 31, 1972 was prepared from the records of Federal and that he prepared this unaudited statement for purposes of the sale of Federal.

This witness was asked if defendants expressed any concern over what the unaudited statement of October 31, 1972 might show, and he replied that defendants were concerned about overbilling on a particular

---

3. Federal Construction Corporation will be referred to as Federal throughout the text of this opinion.

4. Par Electrical Contractors, Inc. will be referred to as Par throughout the text of this opinion.

job and insurance overbilling. He stated defendants mentioned nothing further.

McManus prepared an audited statement for the year ending December 31, 1972. Prior to this statement, adjustments for insurance billing and one job overbilling were discussed. These adjustments were made to the purchase price and reduced the sale price by $13,700.

McManus was asked to define *sound accounting principles.* He replied, "Basically, sound accounting principles are rules and procedures to present fairly financial information." When asked, "What are good accounting principles?", he replied, "In relationship to sound? I think it's a matter of dialectics."

The questioning proceeded further:

"Q. (by Mr. Bayer) Mr. McManus, let's consider for a second generally accepted accounting principles. Within the term generally accepted accounting principles are there various alternatives for doing or for resolving a given accounting problem?

A. Yes.

Q. Could you give some examples?

A. Installment reporting of income. Accrual versus cash accounting of income. Types of inventory evaluation methods. Types of depreciation. There is a great number where there is some options as to what can be reported.

Q. So, these are options that are available to the accountant?

A. Yes.

Q. Does this involve subjective decision making in some cases?

A. Yes.

Q. In some cases is it proper to consult with management to determine what management wants to do and how, given a given accounting problem, will be handled?

A. Yes, it is management's statement and we are there to assist them.

Q. So, conceivably within generally accepted accounting principles if you have two different managers you could have two different procedures?

MR. NORTON: Wait just a moment. Two different managers?

MR. BAYER. Two different managements, officers of the corporation.

A. Yes."

The evidence then turned to the matter of inventory valuation and equipment depreciation. McManus testified he was familiar with the inventory procedures of Federal for purposes of the audited statement (Federal) for December 31, 1971. He testified there were no appreciable additions or deletions to Federal's inventory during 1972.

As to the methods used in inventory[5] valuation, McManus testified that Federal's management had him, as its C.P.A., use the less of cost or market for valuation. Federal had always used the cost method as the lesser between cost and market.

The cost method of inventory for purposes of the unaudited statement of October 31, 1972 was used and the valuation placed at $21,904.13. On the audited statement of December 31, 1972, the inventory valuation was placed at market value, not cost, and the sum was $5,459.34.

McManus testified that at the direction of the new management, the inventory was listed at the value of $5,459.34 on the basis that market value was less than cost value. Other evidence alleged this inventory was sold as scrap or junk for $4,002.80. McManus stated that to arrive at a value of inventory, management is consulted. He further stated that the new management instructed him to take the market value of inventory as the less of market or cost. This is reflected in the following testimony:

"A. A new management had taken over in December, 1972, and at that time they were sorting the inventory to see what was useful and what wasn't useful. In conferring with Mr. Baird, he believed that the val-

---

5. Inventory was identified as the bolts, nuts, wire, etc. of the company.

ue should be lowered from the cost value that we had historically carried on the books.

Q. Mr. Baird advised you that the market evaluation should be less?

A. Yes, he advised me that he thought the inventory was worth approximately five thousand dollars.

Q. Okay,—

A. At that time they were also, their decision was to scrap or salvage a good portion of the inventory rather than try to retain it and use it in the future.

Q. You just referred to it being their decision that they were going to use the inventory for scrap. Whose decision was that?

A. The management, the new management of Federal Construction Company.

Q. And who, specifically, was that?

A. Mr. Baird.

Q. Mr. Baird advised you of that?

A. Yes."

McManus testified that actual physical identification and listing of the inventory should have been made in conformity with sound accounting principles, but he admitted he did not make such identification and listing of the inventory. He observed the inventory, but did not specifically identify or list each item.

The evidence then shifted to the equipment depreciation issue.[6] McManus testified the depreciation for Federal in the year ending December 31, 1971 was $10,471.07 on a straight line method. This sum was approximately 3% of the amount allowable, and the life expectancy of this equipment was from seven to ten years.

The figure for equipment depreciation as of October 31, 1972 was approximately $7,000, and as of December 31, 1972, was $36,396.88. This was testified to by McManus, and he stated this adjustment was made without any appreciable additions or deletions to equipment during the year

1972. McManus also stated that such sums accurately reflected the condition of Federal at those dates, and the methods employed were in accordance with generally accepted accounting principles.

McManus was then asked why more depreciation was taken in 1972. The following colloquy, in response to this question, ensued:

"Q. Okay, what you have just testified to as to an accurate reflection of the condition of the company and the use of generally accepted accounting principles, does that hold true for your decision to enter depreciation deductions of approximately seven thousand dollars on October 31, 1972?

A. Yes.

Q. Why was more depreciation taken in 1972?

A. At the request of management the maximum depreciation was taken that would be allowable for federal income tax purposes, while previous to then we were taking the minimum amount and we had the leeway, according to the federal income tax, of taking either one.

Q. So, it was management's decision on December 31, 1972, to increase the depreciation deduction?

A. Yes.

Q. Who do you mean when you refer to management?

A. Mr. Baird.

Q. Mr. Baird?

A. Yes.

Q. Did he inform you to take the maximum depreciation?

A. Yes.

Q. What, once again, is the difference in the depreciation deduction between December 31, '71, and December 31, '72?

A. In dollars?

Q. Yes.

6. Equipment was identified as trucks, tools or cable drums, post hole diggers, cranes, etc.

A. Approximately twenty-six thousand dollars.

Q. Okay, would this increase in depreciation deduction increase the net operating loss for the company?

A. Yes.

Q. Did it also create a greater deficit in retained earnings?

A. Yes.

Q. In your opinion, did the depreciation deduction taken on December 31, 1972, accurately reflect the condition of the company?

A. Yes.

Q. And you say that that was the deduction taken on twelve, thirty-one, '72, was done in accordance with generally accepted accounting principles?

A. Yes.

Q. Would you answer the same considering that there was a twenty-six thousand dollar difference in depreciation deduction?

A. The amount of that depreciation, the amount that equipment depreciates a year is an arbitrary figure. When we say that it accurately reflects under generally accepted accounting principles, it accurately reflects what the exact worth of the equipment is, we was [sic] not appraising, we generally do not use appraisals in generally accepted accounting principles as far as reflecting in the books.

Q. So, within the ambient of generally accepted accounting principles, however, you could arrive at a difference of twenty-six thousand dollars—

A. Yes.

Q. —in depreciation?

A. Yes.

Q. Okay, is there a difference in accounting for tax purposes and accounting for book purposes?

A. In some cases.

Q. Mr. McManus, you prepared the December 31, 1972 statement, audited statement, is that correct?

A. Yes.

Q. Did you prepare the tax returns for 1972?

A. Yes.

Q. Do you have any recollection of what Federal Construction Corporation's net operating loss was on twelve, thirty-one, '72?

A. My recollection is approximately three hundred thousand dollars.

MR. BAYER: Thank you, that's all the questions I have."

Comparing the total equipment depreciation as reflected upon the statement for the year ending December 31, 1972 and the accounting worksheets of witness McManus, there was some $13,000 difference. McManus explained this difference in two ways. First, he advised the court that an accurate reconciliation of the two figures of $48,000 (rounded) as reflected in the total of the year-end statement and the $35,000 (rounded) as represented by his worksheets could only be made by a comparison with the actual books and records of Federal. The record does not show that these books and records were ever available to the trial court. He then went on to explain that Federal had the practice of fixing up its equipment and that these additions and improvements were then reflected back as capitalization within the equipment and fixed assets of Federal.

When asked about the difference in the rate of depreciation applied to equipment, McManus explained, in addition to his having been directed by the new management or defendants herein to change the rate, that such adjustments of rate are permissible under federal tax laws and are used to gain the most advantageous tax posture for a company during a given year. He stated in support of this statement that, "at that time it was thought most beneficial for income tax purposes." He advised that while the rate of depreciation was changed, the method of application of the rate (straight line) was not.

Plaintiffs' evidence continued with the presentment of testimony of one Gary Maddick, C.P.A., who was qualified as an expert witness for plaintiffs. This witness testified as to the less of cost or market principle and how, under direction of the management of a company, such a method is applied to inventory.

A hypothetical question was proposed to Mr. Maddick concerning the depreciation of $10,000 (rounded and reflected in the year's end statement of December 31, 1972) and $36,000 (rounded and reflected in the year's end statement of December 31, 1972). The hypothetical question assumed no fluctuation in value and no appreciable additions or deletions to equipment. Mr. Maddick testified the only way he could conceive such a change in the depreciation is if the method, life or conditions changed in the second or last year which necessitated a different calculation of depreciation.

Mr. Maddick, upon cross-examination, explained how the method of determining depreciation can be changed from year to year. He testified that the life expectancy of the item or items could be changed. However, he added that under a certified statement or report, such changes should be disclosed and commented upon by the C.P.A. He referred to such changes as a "consistency exception", for which supporting explanation and comment should be furnished. Maddick was never directly asked whether or not such changes, unaccompanied by explanation or comment, failed to comply with sound accounting principles. Rather, he was asked if such practice was good, to which he answered no, it would not be a good practice.

Defense evidence consisted of the testimony of two witnesses. The first was a Mr. Baird who was comptroller for Par and the other was a Mr. Payton, who is President of Par and one of the guarantors on the promissory note.

The pertinent portion of Mr. Baird's testimony is directed to his denial that he ever specifically instructed the accountant McManus to place a value upon the inventory, but that he did offer his opinion to McManus in that he thought the inventory was worthless. Mr. Baird also stated that although he viewed the inventory, he did not make an itemized list or apply any value to any single item in the inventory, but that he told McManus he thought the market value was worthless. He also verified that the inventory had been sold as junk.

When examined about the loss carryover, Baird testified that this loss could not be used by Federal unless a profit above business expenses could be shown. He stated that when he totaled the debts of accountant McManus regarding the equipment for the year 1972, he derived a total of $35,000 (rounded) and the statement of the year ending 1972 reflected the equipment at a value of $48,000 (rounded).

The final witness for defendants was Robert Payton, President of Par. He testified that he went through the warehouse prior to the sale of Federal, and saw some good insulators and some good bolts, but stated that most was junk. He said that at no time did he instruct Mr. Baird or the accountant to value the inventory. He further testified that while the inventory was of concern to him but of no greater individual concern than any other term of the purchase, negotiations included any liabilities that would occur even after the date of the contract.

Payton expressed his feeling that the equipment was inflated in value. He understood the agreement, and more specifically Paragraph 2(a), to be inclusive of liabilities, whether prior to the date of sale or subsequent thereto. He testified that he discussed with accountant McManus and attorney Jackson that the agreement was to contain some provision to take care of any sort of adjustment.

■ Review of this case is made pursuant to Rule 73.01 and under the interpretation of that rule in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

The pertinent findings and conclusions by the trial court held that the application and the use of depreciation utilized and re-

flected in the December 31, 1971 audited statement and the October 31, 1972 unaudited statement was not in accordance with generally accepted accounting principles. The court further held that by use and application of sound accounting procedures, the inventory on the unaudited statement of October 31, 1972 should have reflected the sum of $5,459.34 as the lower of cost or market in the inventory valuation.

The trial court further held that the inventory value adjustment was intended by the parties to reduce the purchase price; that the parties did not intend the purchase price to be reduced by adjustments to equipment depreciation because these values are ordinarily a bookkeeping entry kept for tax purposes and seldom truly reflect the actual depreciation of true value. It is the foregoing findings and conclusions which the parties attack on this appeal.

The trial court's judgment is to be affirmed unless there is no evidence to support the judgment, unless the judgment is against the weight of the evidence, unless the judgment erroneously declares the law or unless the judgment erroneously applies the law, see *Murphy v. Carron, supra.*

In the instant case, the trial court was further faced with defining the phrase "sound accounting principles", as made use of in paragraph 2(a) of the agreement. The trial court concluded the phrase "sound accounting principles" is substantially synonymous with the phrase "generally acceptable accounting principles".

Research reveals there is no great volume of law giving rise to the definition of accounting principles. Even the literature researched on the subject deals, and correctly so, more with the mechanical or practical application of procedural discipline of the accounting profession. In *American Can Co. v. Director of the Division of Taxation,* 87 N.J.Super. 1, 207 A.2d 699, 704 (1965), the court, in its interpretation of a New Jersey taxing statute stated:

"In any event, we entertain no doubt that the statutory phrase, 'sound accounting principles', is and was intended to be substantially synonymous with 'generally

accepted accounting principles', . . ."

The New Jersey Superior Court, in deriving the foregoing definition, relied upon the treatise *Principles of Accounting,* a work by Rufus Wixon, published in 1961 by Ronald Press Co. of New York.

Further, in the case of *Pittsburgh Coke & Chemical Co. v. Bollo,* 421 F.Supp. 908 (E.D. N.Y.1976), aff'd 560 F.2d 1089 (2nd Cir. 1977), a case involving alleged fraud and securities violations, testimony of expert accountant witnesses make use of the term "generally accepted accounting principles".

Within the testimony of the instant case, both expert accountants defined "sound accounting principles". The following is found:

"Q. (By Mr. Bayer) Okay, Mr. McManus, I ask you, what are sound accounting principles?

A. Basically, sound accounting principles are rules and procedures to present fairly financial information.

Q. What are good accounting principles?

A. In relationship to sound?

A. [sic] Yes.

A. I think it's a matter of dialectics.

Q. Is the term of art generally accepted accounting principles?

A. Generally accepted is the most used term."

Later, Mr. Maddick was examined by Mr. Bayer. The following discussion took place:

"Q. Gary, what are sound accounting principles?

A. I don't know. To my knowledge there is no definition of sound accounting principles in any authoritative accounting literature that I'm acquainted with.

Q. Does that same opinion hold true for good accounting principles?

A. That's correct.

Q. How about generally accepted accounting principles?

A. Generally accepted accounting principles are defined in accounting literature."

For authority in Missouri making use of the term "generally accepted accounting principles", see *Rassieur v. Charles*, 354 Mo. 117, 188 S.W.2d 817 (1945), *Aluma Kraft Mfg. Co. v. Elmer Fox & Co.*, 493 S.W.2d 378 (Mo.App.1973) and 4 CSR 10–2.005(b).

■ Premised upon the testimony in the instant case, *American Can Company v. Director of the Division of Taxation, Pittsburgh Coke & Chemical Co. v. Bollo* and *Principles of Accounting, supra*, along with Missouri authority cited herein, it is concluded that the trial court's definition of "sound accounting principles" is a fair, descriptive and workable definition in dealing with problems of accounting procedures, evaluation, credibility and the understanding of the intricacies of the accounting profession.

Both parties attack the findings and conclusions of the trial court as those findings and conclusions interrelate to paragraph 2(a) of the purchase agreement. Specific reference is made to the parties' intentions as to reduction of the purchase price reflected by liabilities and adjustments which should have been made according to "sound accounting principles" in or as of the October 31, 1972 unaudited statement.

It should be noted that the parties, in addition to trial, filed a written stipulation of facts wherein it was agreed the sum of $13,700 would be subtracted from the purchase price. By payment of $5,000 at the time of signing the purchase agreement, plus the agreed-to reduction of $13,700, a claim of $46,300 remained under the terms of the note and purchase agreement.[7]

The resolve of the issues pending herein turns upon whether or not, under the evidence and upon the law, the trial court correctly interpreted paragraph 2(a) of the purchase agreement and whether or not that interpretation, coupled with other evidence upon this record, correctly reflects the intention of the parties regarding the reduction of the purchase price for Federal.

As has been mentioned, the pertinent findings and conclusions by the trial court in summary were that the application and use of the depreciation utilized and reflected in the December 31, 1971 audited statement and the unaudited statement of October 31, 1972 were not in accordance with generally accepted accounting principles; that by use and application of sound accounting principles, the inventory on the unaudited statement of October 31, 1972 should have reflected the sum of $5,459.34 as the lower of cost or market in the inventory valuation; and that the parties intended the inventory adjustment to reduce the purchase price but that the parties did not intend the purchase price to be reduced by adjustments to equipment depreciation.

■ The conclusion reached by the trial court that the methods employed and the depreciation utilized were not in accordance with generally accepted accounting principles is supported by the evidence. Plaintiffs' expert witness (Maddick) testified that an alteration of the rate of depreciation on a straight method in a certified statement must have an accompanying explanation for that alteration of rate. This was referred to as an explanation of a "consistency exception". As applied to the facts of the instant case, this expert witness testified he could not conceive of as great of difference in the depreciation (i. e., from $10,000 to $36,000) in a given year without appreciable additions or deletions, unless the depreciation method or the life or conditions of the items subject to depreciation changed in the second year which would necessitate a different calculation of the depreciation. The life expectancy of the equipment was 7 to 10 years. There were no appreciable additions or deletions to the items subject to depreciation valuation.

The evidence shows no supporting statement or explanation of the "consistency ex-

7. The sum of $13,700 resulted from job and insurance overbilling and the parties agreed to this reduction.

ception" to the depreciation valuation. Based upon the failure of such explanation and the testimony of the expert witness Maddick, the trial court correctly concluded that the application and use of depreciation utilized was not in accordance with generally accepted accounting principles. Thus, the depreciation expense represented by the unaudited statement or report of October 31, 1972 did not reflect the depreciation expense within generally accepted accounting principles. The court further found the parties did not intend that adjustment to depreciation was to affect the purchase price and in the instant case was a bookkeeping entry kept for tax purposes and the method of depreciation used was normally that which produced the greatest tax benefit to the owner. It seldom truly reflected the actual depreciation of its true value.

The evidence is sufficient to support the trial court's finding that the parties did not intend the depreciation to reduce the purchase price. For such intention to have been manifested or even inferred, the method of depreciation would have necessarily had to reflect or bear some relationship to the intrinsic or true value of the items subject to the depreciation allowance. The evidence reveals that expert witness Maddick testified depreciation can be used for tax purposes on the one hand and for bookkeeping purposes on the other. Witness McManus testified that the depreciation methods used and applied were for purposes of gaining a greater income tax advantage.

While the evidence was controverted as to whether or not McManus was instructed to adjust the depreciation amount upward effective the year ending December 31, 1972 and that defendant Payton testified the equipment, in his opinion, had been overvalued, the evidence is most convincing that depreciation of the equipment assets of Federal had, by past practice, been employed to gain advantages for income tax purposes. The evidence further supports the finding that defendants contemplated this continued practice and that the depreciation of the equipment related to its valuation for taxing purposes and not as an expression of its intrinsic or true value.

The definition of depreciation under our own state law appears wanting in a broad definitive sense. In the case of *State ex rel. State Highway Commission v. Cone*, 338 S.W.2d 22, 27 (Mo.1960), and repeated in *Stephen and Stephen Properties, Inc. v. State Tax Commission*, 499 S.W.2d 798, 803 (Mo.1973), the court stated, "Depreciation is considered as being of two types; conditions which are purely physical such as those caused by deterioration from wear and tear, and conditions usually referred to as functional depreciation which covers the effect of obsolescence and loss of adaptability. Even changes in style can be a factor in functional depreciation. The factors involved in a particular case often are complex and subtle." See also *Riccardi v. United States Fidelity & Guaranty Co.*, 434 S.W.2d 737, 741 (Mo.App.1968), where of depreciation it is said, "The word 'depreciation' and the phrase 'depreciation in value' are used and applied in the broader sense of meaning and include any reduction or lessening in value." In *Cassady v. McKinney*, 296 So.2d 94 (Fla.App.1974), the court, in consideration of an assessment statute, held at 97, "Depreciation may refer to either actual loss in value due to deterioration or obsolescence or to the more artificial bookkeeping adjustments made to allocate an item's cost throughout its useful life . . depreciated book value for tax purposes may bear little relation."

On the same subject, 72 Am.Jur.2d *State and Local Taxation* § 774 (1974) states, "It would seem that there is no settled rule for calculating depreciation, and that the method applied by the tax administrator, whatever it may be, will or will not be upheld, as it appears reasonable or unreasonable under the facts and circumstances of the case . . . It has been held that an annual deduction of a fixed percentage of the cost of machinery may properly be made the measure of deterioration in fixing its value for tax purposes where, although not always accurate, it is the only practicable method."

In the instant case, evidence established that Federal often would repair or fix up

equipment long after its original purchase date. Such equipment would again be capitalized and depreciation allowance applied thereto.

Under the facts of the instant case, the evidence supports the trial court's findings that the equipment depreciation was used as a bookkeeping entry for tax purposes and did not relate to the intrinsic or true value of the equipment items. The trial court properly concluded from this evidence that the parties did not intend for the depreciation value adjustment to reduce the purchase price.

Turning to the final conclusions reached by the trial court, and hence the remaining alleged errors presented by the parties, the evidence supports the conclusions of the trial court when it found the valuation of the inventory as represented by the unaudited statement of October 31, 1972 was not made in accordance with generally accepted accounting principles.

Again, the testimony of the two expert accountants must be referred to in the solution of this issue. Plaintiff's expert witness Maddick, after explaining the lower of cost or market method to determine inventory value, testified that the value is determined by management, that invoices showing original cost of purchase and an observation of the physical inventory would be made by the accountant. Witness McManus testified that in accordance with sound accounting principles or generally accepted accounting principles, a physical audit of the items comprising the inventory should be made by the accountant.

Thus, the court's finding that the inventory value adjustment as per the unaudited statement of October 31, 1972 was not made in accordance with generally accepted accounting principles was supported by the evidence.

As regards the inventory adjustment, the court further concluded the parties intended for such adjustment to reduce the purchase price. Upon the year-end statement of December 31, 1971, the inventory was carried as a value of $25,726.99. The unaudited statement of October 31, 1972 carried

the inventory value at $21,904.13. The evidence further supports that these two reports reflected the cost value of the inventory. The evidence shows that defendants observed the inventory during the negotiations and concluded it was virtually worthless.

Unlike the depreciation of equipment referred to above, the inventory of Federal had application for purposes other than mere book value for tax purposes. This inventory consisted of such items as bolts, nuts, wire, electrical connectors and related items accumulated from various past jobs over the years. Some of these items were usable for future jobs. Some of these items were obsolete and hence had no more than scrap value. The inventory possessed an intrinsic or true value as between the parties for the purposes of sale/purchase of Federal.

The evidence supports the change in value of the inventory between December 31, 1971 and December 31, 1972 and the change in the method of valuation of the inventory from cost to market as the lower value. There was no controversy between the parties that the lower of cost or market was the appropriate method to value the inventory. The evidence shows no physical audit was made of the inventory prior to the unaudited statement of October 31, 1972, although under "sound accounting principles" (McManus's testimony) such audit should have been made. The evidence, however, does reflect an adjustment in value of the inventory from cost to market with the latter being a more accurate lower value of the inventory. A great portion of the inventory was sold for scrap, thus supporting the change of value method from cost to market.

Under the evidence, the court properly found the parties intended the inventory adjustment to reduce the purchase price. The evidence revealed that one of defendants' representatives viewed the inventory in November, 1972 and had come to the conclusion that it was almost worthless. This witness also testified that while he could recall no specific reference to the

**516**

inventory value during the negotiation meetings, the value of the inventory had become and was a concern of the purchaser defendants and that an opinion as to its value had been expressed to plaintiffs' accountant.

Further evidence on this point came from defendant Payton, who testified that his understanding with the plaintiffs included the removal of Federal's inventory from the warehouse. This witness further testified it cost more to clean out the inventory than to sell it as scrap.

On this appeal, the plaintiffs argue that the trial court failed to give the phrase "October 31, 1972" its plain meaning. The evidence does not support this contention. In the first instance, the parties do not disagree over the method of valuating inventory as the lesser of cost or market. The evidence shows plaintiffs' accountant did not make a physical audit of the inventory and thus failed to ascertain the lesser of market or cost according to accepted accounting principles. The evidence in addition to the management's decision to change from cost to market shows the value to be as the court concluded, that is, $5,459.34.

It must be assumed the parties intended the language of paragraph 2(a) to have meaning. The trial court heard the evidence and concluded therefrom what the meaning within 2(a) was as between the parties and further what the intent of the parties was within that language as regards the reduction of the purchase price. The result reached by the trial court is supported by the evidence. While it is argued on this appeal that the "plain language" of paragraph 2(a) was not given its plain meaning, this contention based upon the evidence has no merit. The trial court properly concluded that sound accounting principles had not been followed regarding the inventory or the depreciation. The evidence supports the conclusion reached that the depreciation was for book or tax purposes as referred to above. The evidence supports the finding that had sound accounting principles been applied to the

inventory, the correct value of the inventory would have been $5,459.34. The obvious task before the trial court was to discern the intent of the parties through construction of paragraph 2(a). When, as the evidence supports such, the trial court found failure to follow sound accounting principles and the value of the inventory is considered, it is found the trial court did ascribe to this paragraph its plain meaning.

The various alleged errors raised by the parties herein upon this cross-appeal are ruled against them and pursuant to Rule 73.01 as interpreted by *Murphy v. Carron, supra,* the judgment is in all respects affirmed.

All concur.